**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert Edward LIPSCOMB, Defendant-
Appellant.**

**No. 29469.**

United States Court of Appeals,
Fifth Circuit.

Dec. 8, 1970.

Rehearing Denied Jan. 6, 1971.

Robert E. Varner, Montgomery, Ala. (Court Appointed) for defendant-appellant.

Ira DeMent, U. S. Atty., D. Broward Segrest, William H. Thomas, Asst. U. S. Attys., Montgomery, Ala., for plaintiff-appellee.

Before RIVES, WISDOM, and GODBOLD, Circuit Judges.

WISDOM, Circuit Judge:

Robert Edward Lipscomb was convicted by a jury on a one-count indictment charging him with transporting in interstate commerce a stolen motor vehicle knowing it to have been stolen, in violation of 18 U.S.C. § 2312.[1] He was sentenced to serve five years in the custody of the Attorney General. We affirm.

On January 25, 1969, Charles Moore, the manager of a Montgomery, Alabama, department store, reported to the Montgomery Police Department that a Negro male, accompanied by a Negro female, had purchased ladies' clothing by means of an American Express Credit card issued to one Raymond L. Krell. Moore explained that he had checked with American Express and discovered that the card had been reported stolen. He also told the police that the individual who had presented the card in his store was staying at the Midtown Holiday Inn in Montgomery.

Detective Ralph M. Hammonds of the Montgomery Police Department then called American Express and was told that the card had indeed been reported stolen. The company also gave him the telephone number of Raymond L. Krell in Detroit, Michigan. Hammonds placed a person-to-person telephone call to Krell, who explained that his billfold containing his credit cards had been stolen in a Detroit department store while he was trying on clothes.

Acting upon this information, Hammonds and Detective J. D. Wade went to

---

1. § 2312. Transportation of stolen vehicles

Whoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

the Midtown Holiday Inn. At that time they had not obtained either an arrest warrant or a search warrant. Arriving at the hotel, they were informed by the desk clerk that Raymond L. Krell was registered in room 511. The registration card also showed that the registered party was traveling in a 1969 Chrysler automobile, Michigan license number AC–8764, and that there were two persons occupying the room.

As the two policemen started toward the elevator, a Negro man and woman, Robert Edward Lipscomb and Charlene Leota Deering, also approached the elevator. Lipscomb and Deering entered the elevator first, and Lipscomb punched the button numbered five. When the elevator reached the fifth floor, both Lipscomb and Deering and the two policemen got off. The policemen identified themselves and asked Lipscomb his name. He replied, "Raymond L. Krell," and the policemen asked to see some identification. Lipscomb agreed to furnish identification, but insisted on first using the bathroom. The policemen accompanied him to his room, and after using the bathroom, he gave them several identification cards, all in the name of Raymond L. Krell. The policemen noticed that a selective service card listed the race of the registrant Krell as white. Thereupon, they placed Lipscomb under arrest for forgery. They also arrested his companion Charlene Deering for vagrancy.

On going downstairs, the policemen discovered that Charlene Deering was driving a Plymouth automobile with Georgia license plates. She denied any knowledge of the Chrysler listed on the hotel registration card; however, the policemen observed the Chrysler in the hotel parking lot.

The policemen then escorted Lipscomb and Deering to police headquarters. They also took with them the Plymouth automobile and the couple's personal belongings, which were taken at Deering's request. At police headquarters Detective Hammonds proceeded to inventory the personal belongings. During his inspection of a suitcase belonging to Lipscomb, Hammonds found a key which, he later discovered, fitted the door and ignition switch of the Chrysler at the Midtown Holiday Inn in the name of Raymond L. Krell.

On the following day Lipscomb, in the presence of Detectives Hammonds and Wade and an FBI special agent, confessed that he had stolen the Chrysler in Detroit and driven it to Atlanta, Georgia, and then to Montgomery.

On appeal Lipscomb presents some nine major contentions, the most serious of which concern the legality of his arrest without a warrant, the search of his personal belongings and the Chrysler automobile, and the admission into evidence of his confession.

## I.

Lipscomb first contends that his arrest without a warrant was illegal because the police officers had ample opportunity to secure a warrant before arresting him and no unusual circumstances existed to justify their failure to do so.

The validity of an arrest for a state offense by a state officer is determined by state law so long as that law does not violate federal constitutional standards. Ker v. California, 1963, 374 U.S. 23, 37, 83 S.Ct. 1623, 10 L.Ed.2d 726, 740. Under Alabama law a state officer may arrest any person without a warrant

> when a felony has been committed, though not in his presence, by the person arrested, or when a felony has been committed, and he has reasonable cause to believe that the person arrested committed it * * * or on a charge made, upon reasonable cause that the person arrested has committed a felony.

Code of Alabama, 1940, Title 15, § 154. The facts amply demonstrate that the Montgomery policemen acted within the limits of the statute in arresting Lipscomb without a warrant. Conversations with three persons—the Montgom-

ery department store manager, American Express, and Raymond L. Krell—convinced the policemen that a forgery[2] had been committed in connection with the use of a stolen credit card. They knew that the offender was a Negro male, that he was likely to be in the company of a Negro female, and that he was staying at the Midtown Holiday Inn. When Lipscomb, a Negro male matching that description, identified himself as Raymond L. Krell and presented Krell's stolen identification cards, the policemen had more than "reasonable cause" to believe that Lipscomb had committed the forgery.

▆ Neither was Lipscomb's arrest without a warrant unconstitutional under Fourth Amendment standards. An arrest without a warrant is constitutionally valid if at the moment the arrest was made the arresting officers had probable cause to make it. "Probable cause" exists when the arresting officers have knowledge of facts and circumstances or reasonably trustworthy information that would lead a prudent man reasonably to believe that the arrested person had committed or was committing an offense. Beck v. Ohio, 1964, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142, 145; Russell v. United States, 5 Cir. 1968, 396 F.2d 771, 772. *See generally* Comment, The Effect of the Fourth Amendment on Arrests Without a Warrant, 26 La.L.Rev. 789 (1966). On the basis of the facts set out above, we hold that in this case probable cause existed to justify Lipscomb's arrest without a warrant.

## II.

Second, Lipscomb contends that the actions of the police in inventorying the contents of his suitcase and the 1969 Chrysler automobile without a warrant constituted illegal searches and the district court should have suppressed the evidence obtained. Lipscomb argues what may be termed as the "horseshoe nail" principle: but for the warrantless search of his suitcase, the key to the Chrysler would not have been found; but for the key, the vehicle identification number of the Chrysler would not have been found; and but for the key and the vehicle identification number, he would not have confessed to having stolen and transported the automobile. Thus if the district court had properly suppressed the evidence of the key, the vehicle identification number, and the confession, no evidence would remain upon which he could have been convicted.

At the hearing on the motion to suppress and at the trial, Detective Hammonds testified extensively as to the circumstances of Lipscomb's arrest and the inventory of his possessions. We have already described the events leading to the arrest and the arrest itself. Hammonds testified that at the request of Charlene Deering the policemen took all the arrested couple's personal belongings to police headquarters. They also took along the Plymouth automobile that Deering was driving. At headquarters Hammonds began to inventory the personal belongings. He testified that an inventory of the personal property found in the possession of an arrested person at the time of his arrest was a standard operating procedure of the Montgomery Police Department. The purpose of the inventory was to enable the police to know precisely what property they had in their possession and what property in their possession belonged to the arrested person. They then placed those belongings under lock and key for safekeeping. Upon the release of the arrested person, the police returned his property to him.

2. Under Alabama law forgery in the first degree, Code of Alabama, 1940, Title 14, § 199, is a felony, as it is punishable by imprisonment in the state penitentiary. Forgery in the second degree, Code of Alabama, 1940, Title 14, § 200, is also a felony. *See* Code of Alabama, 1940, Title 14, § 207.

Following a trial in an Alabama state court, a jury convicted Lipscomb of forgery in the second degree.

During the course of the inventory, Hammonds found a key inside a suitcase belonging to Lipscomb. On the same day he took the key to the Midtown Holiday Inn and discovered that it fitted the doors and ignition switch of the 1969 Chrysler sitting on the hotel parking lot and registered in the name of Raymond L. Krell. He took the automobile back to police headquarters and searched it to see if there were any other personal belongings in it that should be put under lock and key. As a matter of fact, there was nothing in the automobile. After ascertaining the correct vehicle identification number, the police then locked up the Chrysler at the city lot for safekeeping.

The Fourth Amendment does not forbid all searches and seizures but only those that are unreasonable. Terry v. Ohio, 1968, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889, 899. Whether a particular search is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of the case. Cooper v. California, 1967, 386 U.S. 58, 59, 87 S.Ct. 788, 17 L.Ed.2d 730, 732; Preston v. United States, 1964, 376 U.S. 364, 366–367, 84 S.Ct. 881, 11 L.Ed.2d 777, 780. We hold that in the circumstances of this case the actions of the Montgomery police in inventorying Lipscomb's personal belongings without a warrant did not constitute an unreasonable search. It can not be denied that to prevent escape, self-injury, or harm to others, the police have a legitimate interest in separating the accused from the property found in his possession. An inventory is then necessary both to preserve the property of the accused while he is in jail and to forestall the possibility that the accused may later claim that some item has not been returned to him.

The Sixth Circuit has recently reached a similar conclusion. In United States v. Robbins, 6 Cir. 1970, 424 F.2d 57, the court said,

since the owners of the suitcases were being held in custody, it was the duty of the officers to make an inventory of the contents of the suitcases. Whether the second examination is considered as a continuation of the first search [incident to an arrest] or the taking of an inventory, it was not prohibited by the rule of Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964), or Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

424 F.2d at 59. See also United States v. Blackburn, 6 Cir. 1968, 389 F.2d 93, 95; Cotton v. United States, 9 Cir. 1967, 371 F.2d 385, 392–393; Charles v. United States, 9 Cir. 1960, 278 F.2d 386, 389 n. 2.

We agree that there is nothing in Preston or Chimel that forbids the result we reach here. Both cases concern limits on the attempts of police officers to locate and confiscate incriminating evidence. Chimel in particular was an effort to forestall "the increasing legitimation of wide-ranging warrantless searches of lodgings and buildings based on the fortuity of arrest on the premises, which had been ushered in by United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950)." United States v. DeLeo, 1 Cir. 1970, 422 F.2d 487, 492. Preston and Chimel are thus inapposite in a case such as this, in which the police officers were not attempting to obtain evidence but were simply following their standard procedure for the safekeeping of the accused's possessions.

Moreover, there is no evidence in this case to suggest that the stationhouse inventory was pretextual—that it was merely part of a scheme to avoid the necessity of a search warrant. At the time of the inventory Lipscomb had been arrested for forgery. As yet the police had little reason to believe that Lipscomb had committed any other crime. Although they knew of the existence of the Chrysler, they possessed no information suggesting that it was a stolen automobile. There is no testimony in the record indicating that the intention

of the police officers in taking inventory of Lipscomb's belongings was to locate and confiscate evidence. Rather, the uncontradicted evidence is that the inventory was for the ordinary and reasonable purpose of safekeeping.

Nor are we willing to say that the possibility of a pretextual search is so great in a case such as this that as a matter of law we must condemn the concept of a stationhouse inventory of personal property. Although the situation may indeed arise in which the police, rather than following the strict requirements of *Chimel* for warrantless searches incident to an arrest, simply seize personal property and attempt to search it later under the guise of a stationhouse inventory, that case is not now before us. In this case it was reasonable for the police officers to take all the arrested couple's personal belongings to headquarters, for the hotel management could not reasonably have been expected to permit those belongings to remain indefinitely in the vacated room. Moreover, Deering herself requested that they be taken along, and Lipscomb did not offer any objection or suggest any other arrangement for the safekeeping of their possessions. Once at headquarters the police officers were under a duty to itemize the property and store it for safekeeping. *See* United States v. Blackburn, 6 Cir. 1968, 389 F.2d 93, 95.

■ Without belaboring the point further, we also hold that for the reasons outlined above the vehicle identification number of the Chrysler was not the product of an unreasonable search and need not have been suppressed. Detective Hammonds testified that the Chrysler was taken into custody following Lipscomb's arrest and searched for additional personal belongings for safekeeping. Ordinarily no search warrant would be required for such a procedure, for the reason that it is both reasonable and desirable that personal effects contained within impounded automobiles be protected for the benefit of the owners." Although the police officers in this case discovered no personal effects, they did note the automobile's vehicle identification number. This Court, however, has recently held that it is not unreasonable for police officers to ascertain the correct vehicle identification number, if they are entitled to be on the property where the vehicle is located and if they do not damage the vehicle. United States v. Johnson, 5 Cir. 1970, 431 F.2d 441 (en banc). The rationale for that holding is "that an automobile owner can have no reasonable expectation of privacy with respect to the car's [vehicle identification number]." United States v. Polk, 5 Cir. 1970, 433 F.2d 644. Thus the district court correctly refused to suppress testimony concerning the Chrysler's vehicle identification number.

### III.

■ The district court correctly refused to exclude from evidence Lipscomb's confession. Lipscomb contends that he confessed only after being confronted with the key to the Chrysler and the automobile's vehicle identification number. Thus, he argues, his confession was the product of an illegal arrest and search and should have been excluded. *See* Wong Sun v. United States, 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L. Ed.2d 441; Silverthorne Lumber Co. v. United States, 1920, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319. Since we have already held that Lipscomb's arrest and the inventory of his belongings and automobile were proper, the "fruit of the poisonous tree" argument cannot succeed. Moreover, the uncontradicted testimony of the police officers is that Lipscomb confessed only after being advised of his constitutional rights. Finally, there is no evidence in the record to suggest that his confession was not voluntarily made. Therefore, the district court did not err in refusing to exclude Lipscomb's confession.

### IV.

Lipscomb's remaining contentions concern mainly the admissibility of certain

evidence and the trial conduct of the prosecuting attorney.

Lipscomb contends that the district court erred in admitting evidence of a police officer's conversation with a defense witness Eddie Morris. Morris had testified that he had stolen the 1969 Chrysler in Detroit on about January 21, 1969, and transported it to Montgomery. Lipscomb argues that the Government failed to lay the predicate required by Ayers v. Watson, 1889, 132 U.S. 394, 10 S.Ct. 116, 33 L.Ed. 378, for introducing a prior inconsistent statement to impeach the testimony of a witness.

The record shows, however, that before introducing the testimony of police officer B. E. Reynolds, the prosecuting attorney asked the witness Morris whether he knew Reynolds and whether he recalled January 16, 1969. Morris denied knowing the police officer and stated that he was in Michigan on that date. The Government then called as a witness officer Reynolds, who testified that he had stopped and questioned Morris in Montgomery on January 16, 1969. He also testified that on January 30 Morris told him that he had been in Montgomery from January 16 to January 30. All that *Ayers* requires is that before introducing evidence of contradictory statements counsel call the attention of the witness to the time and place of the conversation and the person involved. *See* 132 U.S. at 404, 10 S.Ct. 116, 33 L.Ed. at 381. We hold that in this case the Government presented sufficient information to establish a predicate for officer Reynolds' impeaching testimony.

## V.

Lipscomb argues that his Sixth Amendment right to confront witnesses against him was denied when the district court admitted into evidence a bill of lading of the Chrysler Corporation. The Government introduced the document to prove that the 1969 Chrysler had been taken from a Chrysler lot in Detroit without authorization from the company, Lipscomb argues that the witness who testified as to the bill of lading was neither the custodian of the document nor the person who made it; thus the bill of lading should not have been admitted.

Business records are admissible in federal court as evidence of a transaction or occurrence if made in the regular course of business and if it was the regular course of business to make such records within a reasonable time of the transaction or occurrence. 28 U.S.C. § 1732(a). The purpose of the federal Business Records Act is to dispense with the necessity of proving each and every book entry by the person actually making it. The theory underlying the Act is that business records in the form regularly kept by the particular company and relied on by that company in the ordinary course of its business have a certain probability of trustworthiness. Louisville & Nashville RR Co. v. Knox Homes Corp., 5 Cir. 1965, 343 F.2d 887, 896; Central R. Co. of New Jersey v. Jules S. Sottnek Co., 2 Cir. 1958, 258 F. 2d 85, 88. Therefore, "so long as regard is paid to the indispensable fundamental trustworthiness of the proffered record, the statute ' * * * should of course be liberally interpreted so as to do away with the anachronistic rules which gave rise to its need and at which it was aimed.' " Missouri Pacific RR Co. v. Austin, 5 Cir. 1961, 292 F.2d 415, 422. Of course, not all records may be admissible in all cases in a criminal trial; it is the duty of the court to determine in each instance whether the particular record is constitutionally admissible under the Sixth Amendment guarantee of confrontation of witnesses. McDaniel v. United States, 5 Cir. 1965, 343 F.2d 785. In this case the district court carefully questioned the witness as to the making of the bill of lading and its use in the ordinary course of Chrysler's business. We conclude that the court did not err in admitting the document into evidence. Even though the witness was not the maker of the bill of lading or its actual custodian, his testimony sufficiently es-

tablished the "indispensable fundamental trustworthiness" of the document.

## VI.

■ Lipscomb further complains that the Government was permitted to impeach the testimony of the defense witness Morris by evidence of wrongdoing on his part. He contends that the statement of a Government witness that Morris had "disposed of some things" for the witness should have been struck from the record. The admissibility of such testimony aside, it appears from the record that Lipscomb made no objection or motion to strike the answer in the trial court. "Where no good reason is shown for the failure of appellant's trial counsel to object to the admission of evidence, the objection is deemed to have been waived." Puryear v. United States, 5 Cir. 1967, 378 F.2d 29, 30. Moreover, the alleged error cannot, in the circumstances of this case, be classified as "plain error" under Rule 52(b) of the Federal Rules of Criminal Procedure so as to obviate the necessity of a timely objection.

## VII.

Lipscomb complains of the admission of the Midtown Holiday Inn registration card showing that Raymond L. Krell occupied room 511. On the face of the card someone not connected with the hotel management—probably a police officer—had written "Robert E. Hamilton," another alias that Lipscomb had been using. Lipscomb also complains that the court allowed the Government to introduce evidence of his use of stolen credit cards, a matter wholly extraneous to this Dyer Act charge.

■ The defendant alleging error in the admission of evidence in a criminal trial has the burden of showing both that there was error and that it was prejudicial. McMahan v. United States, 7 Cir. 1970, 424 F.2d 1216, 1219; Ryno v. United States, 9 Cir. 1956, 232

F.2d 581, 584. Moreover, an error that might have been prejudicial in a close case does not require reversal when the evidence of the defendant's guilt is strong. Lowe v. United States, 8 Cir. 1968, 389 F.2d 108, 112; Holmes v. United States, 1967, 127 U.S.App.D.C. 332, 383 F.2d 925, 931–932. In this case the Government's evidence of guilt—including Lipscomb's confession—is substantial. Considering the record in its entirety, we are unable to say that Lipscomb was prejudiced by the admission of these extraneous matters.

## VIII.

■ Lipscomb further contends that the prosecuting attorney exhibited far too much zeal in the prosecution of the case and in doing so committed numerous errors the accumulation of which requires reversal. We find no merit in that contention. Although the prosecuting attorney once raised his voice and was duly admonished, there is no other evidence in the record to suggest that he wholly departed from his duty to see that justice is done. As for the specific errors complained of, we consider them harmless. This is not a case in which the "cumulative effect impels the conclusion that appellant was deprived of a fair trial." O'Brien v. United States, 5 Cir. 1969, 411 F.2d 522, 528 (Godbold, J., dissenting).

## IX.

■ Finally, Lipscomb contends that because the jury panel submitted to him for selection of a trial jury contained no Negro males,[3] he was deprived of the equal protection of the laws. The Constitution, however, forbids only "systematic" exclusion of members of the same class as the defendant from jury service. See Hernandez v. Texas, 1954, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866. It is clear from the record that the plan for the selection of juries used in the Middle District of Alabama does not systematically exclude Negro males.

---

3. The jury panel did, however, contain the names of several Negro females.

There is no evidence in the record to suggest that the district court did not follow that plan in selecting the jury panel for this case.

Therefore, the judgment of the district court is affirmed.